## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NINA M. COLEMAN,**<br><br>Plaintiff,<br><br>**v.**<br><br>**ALEJANDRO MAYROKAS, Secretary of Homeland Security. et al.,**<br><br>Defendants.[1] | Civil Action No.<br>19-cv-3496-MAU |

## <u>MEMORANDUM OPINION</u>

Plaintiff Nina Coleman ("Coleman") brings claims of racial discrimination and retaliation against her former employer Defendants Secretary of Homeland Security and the Administrator of the Federal Emergency Management Agency ("FEMA" or "Defendants") under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. *See* ECF No. 31. Before the Court is Defendants' Motion for Summary Judgment. ECF No. 39. Because Coleman has failed to raise a triable issue on either one of her claims, the Court grants Defendants' Motion.

## FACTUAL SUMMARY

In late 2012 and early 2013, Coleman was deployed to FEMA's Joint Field Office in Forest Hills, New York. *See* ECF No. 39-2 ¶ 1. From November 4, 2012, until January 30, 2013, Coleman worked as a Community Relations Assistant Manager to assist with the Agency's disaster relief efforts in New York following Hurricane Sandy. *Id.* ¶¶ 2-3. Coleman's responsibilities in Forest Hills included serving as the "FEMA for Kids Team Lead." *Id.* ¶ 5. Her supervisors were

---

[1]     Alejandro Mayorkas, lead Defendant and current Secretary of Homeland Security, is substituted for Chad Wolf. The caption is updated in court documents per Federal Rule of Civil Procedure 25(d).

Rita Ramos, the Community Relations Lead for the Joint Field Office, and Betty Bell, the Deputy Community Relations Lead. *Id.* ¶ 7. Bell and Ramos became her supervisors on or around January 11 and 15, 2013, respectively. ECF No. 41-1 ¶ 4.

On January 16, 2013, one day after Ramos became her supervisor, Coleman arranged for an alternative dispute resolution (ADR) meeting with her supervisors to address concerns regarding her treatment. *Id.* ¶ 5. Specifically, Coleman claims that Ramos and Bell were rude to her, made decisions without her input, and favored her coworkers. See ECF No. 39-9 at 4; ECF No. 39-10 at 2. Coleman was the only person to attend the meeting. *Id.* Although Coleman claims her supervisors ignored her request for a meeting, her own exhibit reflects the opposite. As one of her supervisors wrote: "We were in a restructuring meeting for a long time and I was not aware of your request to meet in ADR. I apologize for how that may have made you feel." ECF No. 41-2 at 51.

On January 18, 2013, Coleman spoke with Ramos about her concerns that she was being ignored and disrespected. She sent an email soon after to Ramos, Bell, and three others detailing that discussion. ECF 41-1 at 4-5 ¶¶ 7-11. On January 19, 2013, Coleman met with Ramos and Don Hawkins, another FEMA employee, privately. *Id.* ¶ 12. It does not appear that Hawkins was a supervisor, but rather, according to Coleman, she "selected Mr. Hawkins to be a witness on [her] behalf." *Id.* Coleman claims that, at this meeting, Ramos informed her that she would be demoted. *Id.*

On January 22, 2013, Coleman met with Jorge Gonzalez (Community Relations Manager for Needs and Demographics), Ramos, and Bell to discuss her issues with management further. *Id.* ¶ 13; ECF No. 39-2 ¶ 8. At this meeting, Coleman requested to be reassigned from Forest Hills to the Agency's Area Field Office, Branch 2, in Woodbury, New York. ECF No. 39-2 ¶¶ 8-9.

Immediately after the January 22 meeting, Coleman sent two emails confirming her request for a transfer to the Branch 2 field office in Woodbury.  ECF No. 39-2 ¶ 9; ECF No. 39-13 at 2; ECF No. 39-14 at 2.  Despite her request at the January 22 meeting and her two follow-up emails confirming her request, Coleman now claims that her request to be transferred was not a "formal" request, but rather one she made "out of frustration" and because "her spirit was depleted."  ECF No. 41-1 ¶ 14.  Neither email, however, referenced a January 19 meeting at which Ramos allegedly told Coleman she was being "demoted."  Nor is there any evidence, in the emails or otherwise, reflecting that Coleman was not sincere when she requested to be transferred and that she was doing so only because she was frustrated.

Ramos granted Coleman's request for reassignment, which ultimately became effective on January 30, 2013.  ECF No. 39-2 ¶¶ 10-11.  On January 24, 2013, Coleman emailed Ramos, Gonzalez, and Bell asking to remain in her position as Team Lead on FEMA for Kids to no avail.  ECF No. 41-1 ¶ 19; ECF No. 41-2 at 10-11.

Coleman's new work assignment at the Area Field Office in Woodbury, as the Community Relations Assistant Manager in support of the Agency's Hurricane Sandy disaster relief efforts, lasted from January 30, 2013, until February 22, 2013.  ECF No. 39-2 ¶ 11.  Although Coleman's pay and responsibilities remained the same, she claims that the transfer was a "demotion" because she could no longer serve as Team Lead for FEMA for Kids.  *Id.* at ¶¶ 12, 15.

On January 28, 2013, Coleman received a performance evaluation for her work as an "Assistant Manager for the FEMA for Kids component."  ECF No. 41-1 ¶¶ 26-27.  Of the fourteen elements rated, Coleman was rated as satisfactory on all but two.  *Id.*  The two highlighted areas concerned Coleman's relationship with co-workers and supervisors.  *Id.*  Coleman was replaced by Judith Diane Easterling as the Team Lead for FEMA for Kids.  *Id.* ¶ 29.

## PROCEDURAL HISTORY

Coleman made initial contact with an EEOC counselor on January 23, 2013 and filed a formal EEO complaint on February 2, 2013.  ECF No. 39-2 ¶ 18.  On July 17, 2019, the EEOC issued a Final Agency Decision ("FAD") determining that FEMA discriminated against Coleman on the basis of her race.  ECF No. 39-22 at 17.  This decision was based primarily on an adverse inference that the agency drew due to FEMA's failure to supplement the administrative record with a statement from Hawkins.  *Id.*  In doing so, the Civil Rights Office found that the requested testimony would have established that Ramos removed Coleman as Team Lead against her wishes and that Ramos' explanation that Coleman requested her own transfer off the FEMA for Kids Team was unworthy of credence.  *Id.*  By virtue of the FAD, Coleman was entitled to file for compensatory damages, attorneys' fees, and costs within thirty days of receiving notice.  Coleman did not submit additional evidence.  ECF No. 39-1 at 18.  Instead, Coleman abandoned her administrative claim and filed a complaint in the U.S. District Court for the Northern District of Texas on July 3, 2019, which was later transferred to this Court.  ECF No. 3.

## ANALYSIS

### I.  Standard of Review

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation; factual disputes that are "irrelevant or unnecessary" do not affect the summary judgment determination.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the nonmovant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir.

4

2006).  The Court's inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact.  *See id.* at 323; Fed. R. Civ. P. 56(c)(1).  In response, the party opposing summary judgment must point to specific facts in the record that reveal a genuine issue that is suitable for trial.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  It "must set forth specific facts showing that there [are] genuine issue[s] for trial."  *Anderson*, 477 U.S. at 248.  Conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## II.     Title VII of the Civil Rights Act of 1964

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against its employees based on race or color, among other characteristics.  42 U.S.C. § 2000e-16(a); *see also Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019); *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  "Proof of illicit motive is essential," and the employee "at all times" has the burden of proving "that the defendant intentionally discriminated against" her.  *Id.* at 1265, 1267 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Where there is only circumstantial evidence of discrimination, as is the case here, the *McDonnell Douglas* burden-shifting framework governs the analysis.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973); *see also Figueroa*, 923 F.3d at 1086 (citing *Wheeler v.*

*Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016)).   Under this framework, the employee "must first make out a prima facie case" of discrimination.   *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019).   To do so, a plaintiff must show that she is part of a protected class under Title VII, that she suffered a cognizable adverse employment action, and that the action gives rise to an inference of discrimination.   *Wheeler*, 812 F.3d at 1113.   The burden then shifts to the employer to "come forward with a legitimate reason for the challenged action."   *Iyoha*, 927 F.3d at 566.   Four factors are "paramount in the analysis" of whether an employer has met its burden at step two: (1) the employer must produce evidence that would be admissible at trial for a finder of fact; (2) "the factfinder, if it believed the evidence, must reasonably be able to find that the employer's action was motivated by a nondiscriminatory reason"; (3) the employer's justification must be "facially credible in light of the proffered evidence" not pretextual; and (4) the employer must provide a "clear and reasonably specific explanation" for its action that is "articulated with some specificity."   *Figueroa*, 923 F.3d at 1087-88.   If the employer meets that burden, it shifts back to the employee, who must prove that, despite the proffered reason, she has been the victim of intentional discrimination.   *Id.*

The framework articulated above "appl[ies] equally to retaliation claims."   *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).   Under that framework, a plaintiff must first establish a prima facie case of retaliation by showing that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action by his employer; and (3) a causal link connects the two.   *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).   In addition, a plaintiff must show that the person responsible for her adverse action had knowledge of her protected activity.   *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011).   If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a "'legitimate, nondiscriminatory reason'" for

its actions. *Wiley*, 511 F.3d at 155 (quoting *Burdine*, 450 U.S. at 253). If the employer does so, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence," which includes not only the prima facie case but also the evidence the plaintiff offers to "attack the employer's proffered explanation for its action" as pretextual and other evidence of retaliation. *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

### III.   Count I: Coleman's Race Discrimination Claim

In Count I of her Amended Complaint, Coleman claims that Defendants reassigned her to the field based on her race. ECF No. 31 ¶¶ 30-35. Defendants argue that they had a simple, legitimate, nondiscriminatory reason for reassigning Coleman: she asked for it. ECF No. 44 at 1-2.[2]

#### A. Defendants' Legitimate, Nondiscriminatory Reason for Coleman's Transfer

There is no genuine dispute that Coleman requested to be transferred to the field office in Woodbury. Defendants rely on the affidavits of Ramos and Bell, who both stated that Coleman made the request. *See* ECF No. 39-5 at 5 ("I responded to [Coleman's] request asking to 'return to the field' which I fulfilled by finding a work assignment for her in the field. [Coleman] verbally requested this work assignment at a meeting with the ADR [representative] and Deputy CR Lead [Betty Bell]); ECF No. 39-12 at 4 ("She was not removed from the FEMA-for-Kids Team Lead Function, she requested to be transferred to the field."); *see also* ECF No. 39-2 ¶¶ 8-10.

Coleman does not dispute that she made the request. ECF No. 41-1 at 5. Indeed, her own contemporaneous emails confirm this fact. *See* ECF No. 39-13 at 2 ("I met with Rita, Betty, and

---

[2]   For purposes of this analysis, the Court assumes that Coleman has made her prima facie case on Count I.

Jorge and asked to go back to Branch II); ECF No. 39-14 at 2 ("And I asked to return to Branch II . . . [Rita Ramos] is supposed to make arrangement for me to return to Branch II."). Instead, Coleman now suggests that her request was not a sincere one, claiming that she only made it half-heartedly and out of "frustration and because her spirit was depleted." *See id.* Moreover, Coleman claims that her request was not "formal,", implying that this somehow negates the legitimacy of her request. *Id.*

Neither one of these arguments raises a genuine dispute over whether Coleman requested to be reassigned and whether Defendants had a legitimate, nondiscriminatory reason for her transfer. First, Coleman's claim that her request was not "formal" does not raise any triable issue. Coleman does not provide any explanation for what she means by "formal"; nor does she offer any evidence that a "formal" request (whatever that might mean in this context) was required for the request to be effective. ECF No. 41 at 5. Her argument is undermined, moreover, by the evidence, which reflects that Coleman made the request in a formal ADR meeting with her supervisors and then followed up at least twice in writing. Second, the fact that Coleman may have been frustrated when she made the request does not negate the fact that she asked for a reassignment. Coleman offers no evidence that she conveyed her alleged insincerity to her supervisors. To the contrary, Coleman's own written contemporaneous statements underscore the fact that she wanted Defendants to process the reassignment. *See* ECF No. 39-13.

Accordingly, there is no genuine dispute that Defendants have pointed to a legitimate, non-discriminatory reason for Coleman's reassignment. As such, the burden shifts to Coleman to show that the reason for the reassignment was pretext for intentional discrimination. At this stage, the Court "must conduct one central inquiry . . . : whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the

actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Iyoha*, 927 F.3d at 566.

### B. Coleman has Failed to Offer Sufficient Evidence for a Reasonable Juror to Conclude that the Proffered Reason for Coleman's Transfer was Pretext for Race Discrimination

Coleman makes a number of disparate arguments in an attempt to show that the reason for her reassignment was pretext for racial discrimination. None of these arguments, however, raises a genuine dispute warranting trial on Count I.

#### i. *January 22 and Preceding Meetings*

In an attempt to raise a dispute in the face of her undisputed request to be transferred, Coleman now argues in conclusory fashion that "a genuine dispute of material fact exists as to what exactly happened during" the January 22 meeting. ECF No. 41 at 5. Coleman fails to offer any specifics about what the purported dispute is and merely argues that FEMA has not produced "evidence or supporting testimony" beyond that of Ramos and Bell. *Id.* To the extent that Coleman has evidence which raises a genuine issue as to discrimination, however, it is her burden at this stage to raise it. The record is clear that Coleman failed to take any depositions in this case. Without more, this purported "dispute" about what occurred during the January 22 meeting, particularly in light of Coleman's contemporaneous statements, is not enough to show any evidence of pretext.

Coleman's claims regarding an earlier meeting on January 19, 2013 with Ramos and Hawkins at which Ramos allegedly told Coleman she was being demoted also fail to raise a triable issue as to pretext. *See* ECF No. 41-1 at 5 ¶ 12; ECF No. 39-24 at 3. The only evidence that such a meeting occurred is Coleman's own statements in litigation. *See e.g.*, ECF No. 39-20 at 13. Moreover, despite documenting the events of that time period in contemporaneous emails, there is no evidence that Coleman mentioned it during the January 22 meeting or in the two subsequent

emails in which she requested the transfer.  *See* ECF No. 39-13 at 2; ECF No. 39-14 at 2.  As stated above, Coleman does not appear to have attempted to depose either Hawkins or Ramos in this case.  Nevertheless, even assuming as true Coleman's assertion that Ramos told Coleman on January 19, 2013 that she was being demoted, the fact remains that Coleman still requested the transfer during the January 22 meeting and in the two subsequent emails.  And even accepting Coleman's version of the events of that day as true, there is no evidence to raise a genuine dispute that the alleged "demotion" was motivated by race.

### ii.   Coleman's Change of Heart

Coleman claims that after she made and reiterated her request on January 22, 2013, she changed her mind and FEMA refused to accept her change of heart.  ECF No. 41-1 at 5.  This also fails to raise a triable issue as to pretext.  There is no evidence that FEMA's refusal to reverse course upon Coleman's request for a transfer was motivated by racial discrimination.  ECF No. 41-2 at 10-11.  As FEMA states, Coleman was an at-will employee and, as Ramos stated during the January 22, 2013, meeting, Coleman was her "best" in the field.  ECF No. 41-1 at 5 ¶ 16. Ramos obliged Coleman's request immediately noting, "in response to [Coleman's] request to return to the field, I accepted her request and said I would check with Operations to identify a work assignment for her."  ECF No. 39-2 at 4.  The Court will "not second-guess an employer's personnel decision absent demonstrably discriminatory motive.  Once the employer has articulated a non-discriminatory explanation for its action," the Court will not find pretext if "the employer honestly believes in the reasons it offers." *Fischbach v. Dist. of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  Here, Coleman has failed to raise any genuine dispute to suggest otherwise.

### iii.   Alleged Conduct Toward Coleman

None of the alleged discriminatory acts upon which Coleman relies raise a genuine dispute that Defendants intentionally discriminated against Coleman based on race.  In the five days in which Bell was Coleman's supervisor, Coleman alleges that Bell "rolled her eyes" when Coleman spoke and generally did not treat her fairly.  *See e.g.*, ECF No. 39-19 at 4 ("Betty also rolled her eyes at me every time I spoke in a FEMA for Kids planning meeting at 1 pm on Jan 18th, 2013 . . ."); ECF No. 41-2 at 3 ("After a day or so I saw more favoritism, Betty [Bell] comes to our area and speaks to everyone but me, pats Kenny Smith on th [sic] back, says hello to Nick and speaks with Diann, Judith Easterling who they later walks out towards the elevators.").  Although Bell's conduct may have been rude or reflected a clash of personalities, her behavior without more does not raise an inference of discrimination on the basis of race.  *See Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (finding "petty slights or minor annoyances that often take place at work and that all employees experience" are not themselves actionable under Title VII).

Coleman also suggests that Ramos calling Coleman "feisty" like another African American employee, Yvonne Wilson, is reflective of racial discrimination.  ECF No. 41-1 ¶ 15.  There is no evidence in the record that this comment was racially motivated or can be causally linked to the reasoning underlying Coleman's transfer, especially in the face of Coleman's own request.

   *iv.* *Coleman's Replacement*

Coleman's argument as to her replacement at FEMA for Kids, Judith Easterling, is also unavailing.  For one, the only evidence that Coleman offers in support of Easterling's lack of qualifications is her own statement.  *See* ECF No. 39-21 at 3-4; Fed. R. Civ. P. 56(c) (materials offered to support or oppose a fact during summary judgment must be capable of being offered at trial in an admissible form).  In addition, Easterling's alleged lack of qualifications for the FEMA

for Kids Team Lead is of no moment because FEMA does not contend that Coleman was replaced because Ramos deemed Easterling better qualified than Coleman. *See* ECF No. 39 at 11. Instead, the record reflects that Coleman was transferred because she requested to be transferred.

<em>v.    Office of Civil Rights' Final Agency Decision</em>

Finally, Coleman argues that FEMA's submission of Hawkins' declaration in litigation "without explanation" is somehow nefarious or raises a genuine dispute as to racial discrimination. ECF No. 41 at 6-7. Originally, the Civil Rights Office drew an adverse inference against FEMA for its failure to provide a statement from Hawkins during the initial Equal Rights Office investigation. *See* ECF No. 39-22. The fact that FEMA offered a declaration from Hawkins in litigation but did not do so during the EEO investigation does not raise an inference of pretext. *See* ECF No. 41-1 at 6 (arguing that "Defendant's tender of the declaration during summary judgment is highly indicative of pretext"). Rule 56(c)(4) allows a party to include declarations in support of summary judgment. Moreover, Coleman could have deposed Hawkins but chose not to. Hawkins has provided a declaration and disclaims any memory of the January 19 meeting. ECF No. 39-20. The justification for the adverse inference no longer exists nor is it persuasive to the Court.

Coleman has failed to produce any evidence that would demonstrate to a reasonable jury that FEMA's reason for transferring her was not the actual reason for her reassignment. Nor has she raised any issues warranting a trial on whether Defendants intentionally discriminated against her on the basis of race. Thus, the Court will grant Defendants' motion for summary judgment with respect to Coleman's race discrimination claim in Count I.

**IV.    Count II: Coleman's Retaliation Claim**

Coleman makes a two-paragraph argument in support of her retaliation claim.  Coleman argues that she engaged in protected activity when she complained that Bell and Ramos were "discriminating against her" in January 2013.  *See* ECF No. 41 at 7 (citing Pl.'s Exs. E, F, G, and Q and ECF No. 39-21 at 3).  She further claims that Defendants transferred her in retaliation for her having engaged in that protected activity.  *Id.*

In response, FEMA argues that Coleman did not participate in any protected activity before she requested to be transferred on January 22, 2013, *i.e.*, the adverse employment action.  ECF No. 44 at 7-10.  Even if she did, FEMA argues that Ramos did not have any knowledge of Coleman's complaints and, thus, could not have retaliated against her.  *Id.* at 9.

In evaluating Coleman's claim, the Court is concerned about whether Coleman can even make out a retaliation claim as a matter of law when the record is clear that she herself voluntarily requested the transfer that she claims is the alleged "retaliation."  Assuming for the sake of argument that she can, however, the first question is whether there is any genuine dispute that Coleman engaged in any protected activity as a matter of law *prior* to her request to be reassigned on January 22, 2013.  Coleman fails to point to any specific act which she claims constituted protected activity or date on which it occurred, claiming only generally that she made complaints in or around January 2013 about discrimination.  When examined closely, the exhibits she cites in support of her argument that she engaged in protected activity reflect at best her frustrations regarding chain of command and a perceived lack of respect.  Even read in a light most favorable to Coleman, the messages are devoid of allegations of unlawful discrimination outside of vague references to "unfair treatment."  These messages relate almost exclusively to the management style of her superiors and Coleman's complaints that she is not kept in the loop with certain items about which she claims she should have had input.

13

For example, Coleman's January 16 email stated that the intended purpose of the meeting was to "discuss the issues I feel are important to me such as no one keeping me in the loop and dictating orders to me," a discussion she had with Bell about her lunch break, and her new manager's unfamiliarity with her responsibilities as FEMA for Kids Lead.  *See* ECF No. 41-2 at 51; *see also* ECF No. 41-2 at 235 ("I have been frustrated some time now with how FEMA for Kids has been handled and I now see the patterns is continuing, one being I am left out of the loop with the decision making of FEMA for Kids.").  Coleman's subsequent emails do not deviate from the thrust of her complaints regarding management.  *See id.* at 54 ("I feel like I have not been treated fairly as the team lead of FEMA-for-Kids and decisions are being made without anyone sitting down with me to find out . . . what has been accomplished and how."); *id.* at 76 ("But as I have stated so many times my new chain of command has allowed all this chaos because they haven't respected me as a lead and have put friends on the team and gone to the team for information and asking them to send them the up [sic] schedule of upcoming presentations instead of asking me.").  Coleman fails to point to any complaint about unlawful discrimination or disparate treatment on the basis of her race.  The closest she gets in her complaints to management about any protected status is her age.  *See* ECF No. 41-2 at 58 ("As I have stated several times, I do not feel I have been treated fairly as team lead.  I do not know if its because I am younger than my managers but I know it can't be because of not having experience.").

Coleman has failed to raise any genuine dispute that she was engaged in protected activity as a matter of law by complaining about unlawful discrimination on the basis of race before January 22, 2013, when her supervisors granted her transfer request.  Rather, the emails reflect Coleman's frustration with her supervisors' management style, or the "ordinary tribulations of the workplace."  *See Byrd v. Vilsack*, 831 F. Supp. 2d 27, 46 (D.D.C. 2013) (quoting *Faragher v. City*

14

*of Boca Raton*, 524 U.S. 775, 788 (1998)); *see also Peters v. Dist. of Columbia*, 873 F. Supp. 2d

158, 204-05 (D.D.C. 2012) (finding complaints about supervisor conduct and "poor evaluations"

did not constitute protected activity absent an allegation of unlawful discrimination); *Broderick v.*

*Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006) ("While no 'magic words' are required, the

complaint must in some way allege unlawful discrimination, not just frustrated ambition."). None

of her complaints ever touch on or claim unlawful discrimination or disparate treatment *on account*

*of Coleman's race*. To the extent there was any cognizable protected activity, the record reflects

that it occurred on January 23, 2013, when Coleman spoke to the EEO counselor. ECF No. 44-1

at 9 ¶ 18.

Because Coleman's complaints prior to her reassignment do not rise to Title VII protected

activity, Coleman's retaliation claim must fail. Specifically, there is no genuine dispute as to

retaliation because the only cognizable alleged protected activity happened *after* the purported

adverse action on January 22, 2013. As Defendants note, this would defy temporal logic as the

alleged effect would have occurred before the alleged cause. ECF No. 39-1 at 20 ("Ms. Ramos

could not have removed Plaintiff from her Team Lead role in retaliation for initiating contact with

the EEO counselor on January 23. The challenged action had already occurred on or before January

22, 2013, and Plaintiff says she first learned of it on January 19.").

The Court will grant summary judgment in favor of FEMA on Coleman's retaliation claim.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary

judgment. A separate order dismissing the case will issue.

**SO ORDERED**.

Date: December 1, 2022

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE